**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MYANKHAI BATCHULUUN,<br>Individually and On Behalf of All Others<br>Similarly Situated,<br><br>      Plaintiff,<br><br>v.<br><br>WINGSTOP INC. and CONVERSENOW<br>TECHNOLOGIES, INC.<br><br>      Defendants. | Case No. _____<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Myankhai Batchuluun ("Plaintiff"), individually and on behalf of all others similarly situated, bring this Class Action Complaint for violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), against Wingstop Inc. ("Wingstop") and ConverseNow Technologies, Inc. ("ConverseNow"), and alleges as follows based on personal knowledge as to himself and on the investigation of counsel.

## NATURE OF THE ACTION

1.      This lawsuit arises out of Defendants' actions in collecting, capturing, otherwise obtaining, using, and/or storing the biometric identifiers and/or biometric information, including the unique "voiceprints," of Plaintiff and other similarly situated individuals, without informing them in writing or obtaining their written consent, as required by BIPA.

2.      As the Illinois Legislature has recognized,

> [B]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, even sensitive

1

> information such as Social Security numbers can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions.

*Carpenter v. McDonald's Corp.*, 580 F.Supp 3d 512, 515 (N.D. Ill. 2022) (citing 740 ILCS 14/5); *see also Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 619 (7th Cir. 2020) (noting the "threat of irreparable privacy harms, identity theft, and other economic injuries" arising from biometric data).

3.      In light of these privacy concerns, the growing use of biometrics in various contexts, and the fact that "[t]he full ramifications of biometric technology are not fully known," BIPA was enacted to regulate how private entities may collect, use, and/or store individuals' biometric identifiers, including voiceprints, and biometric information. 740 ILCS 14/5.

4.      BIPA, provides, *inter alia*, that no private entity may collect, capture, or otherwise obtain biometric identifiers (including voiceprints) or biometric information without first informing the subject in writing of the fact, purpose, and length of the collection and receiving a written release from the subject. 740 ILCS 14/15(b). BIPA also prohibits private entities from profiting from the biometric identifiers or information. 740 ILCS 14/15(c). BIPA further requires that private entities in possession of biometric identifiers or biometric information must develop a publicly available written policy establishing a schedule for their retention and, importantly, their destruction, within certain statutory time limits. 740 ILCS 14/15(a).

5.      Although BIPA was enacted in 2008, Defendants have been violating the statute by collecting, capturing, otherwise obtaining, using, and/or storing the unique and highly sensitive "voiceprints" of thousands of individuals in Illinois, without their knowledge or consent, through the use of artificial intelligence ("AI")-assisted voice technology for Wingstop's customers'

telephone orders, developed by Defendant ConverseNow.

6.      Defendants do not appear to have publicly available retention or destruction schedules relating to biometric identifiers or biometric information, so it is likely that Defendants are retaining Plaintiff's and other Class members' biometric identifiers and/or biometric information beyond the time limits set by BIPA.

7.      Plaintiff brings this action, on behalf of all individuals who had their voiceprints, biometric identifiers, and/or biometric information collected, captured, otherwise obtained, used, and/or stored, when making a telephone order at a Wingstop location in Illinois at any time within the applicable statute of limitations, to prevent Defendants from further violating Illinois law and to recover damages for Defendants' violations of his and other Class members' statutorily-protected rights to privacy under BIPA.

## THE PARTIES

8.      Plaintiff Myankhai Batchuluun is, and has been at all relevant times, a resident and citizen of Arlington Heights, Illinois. In February 2023, Mr. Batchuluun called the Wingstop location at 1312 E Rand Road, Unit 1, Prospect Heights, Illinois, to place an order for food, and interacted with AI-assisted voice technology during that call.

9.      Defendant Wingstop Inc. ("Wingstop") is incorporated in Delaware and maintains its principal place of business in Texas. Wingstop is the largest fast casual chicken wings-focused restaurant in the world, with system-wide sales for fiscal year 2023 of $3.5 billion.[1] Wingstop has over 2,200 locations worldwide – 1,500 of which are in the United States.[2] There are

---

[1] Wingstop 2023 Form 10-K (Dec. 30, 2023), *available at* https://ir.wingstop.com/wp-content/uploads/2024/02/2023-Annual-Report.pdf ("Wingstop 2023 10-K"); *see also* https://ir.wingstop.com/wingstop-inc-reports-fiscal-fourth-quarter-and-full-year-2023-financial-results/.

[2] Wingstop 2023 10-K; Wingstop 2022 Investor Day Presentation (May 17, 2022), *available at*

approximately 120 Wingstop locations in Illinois.

10.    Defendant ConverseNow Technologies Inc. ("ConverseNow") is a private AI startup company founded in 2018, incorporated in Delaware, and headquartered in Texas. ConverseNow's patented voice AI technology is utilized at more than 1,800 stores in 46 states, including in Illinois.[3] ConverseNow "proudly operate[s] in more stores than any other restaurant voice AI company" and "processes[es] millions of live conversations each month."[4]

## JURISDICTION AND VENUE

11.    This court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d) because there are more than 100 Class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from at least one Defendant.

12.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(1) and (c)(2) because Defendants do business in and are subject to personal jurisdiction in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

### I.    Illinois's Biometric Information Privacy Act

13.    Recognizing the "very serious need [for] protections for the citizens of Illinois

---

https://ir.wingstop.com/wp-content/uploads/2023/06/WING-Investor-Day-2022_compressed.pdf ("Wingstop Investor Day Presentation"), at 65.

[3]    https://conversenow.ai/company/;    https://hospitalitytech.com/news-briefs/2023-12-03?article=conversenows-voice-ai-assistants-redefine-restaurant-industry-outstanding-milestones-and-growth.

[4] https://conversenow.ai/technology/.

when it [comes to their] biometric information," the Illinois Legislature enacted BIPA in 2008. Illinois House Transcript, 2008 Reg. Sess. No. 276. BIPA regulates, *inter alia*, "the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(g).

14.     Under BIPA, a "biometric identifier" refers to a person's "retina or iris scan, fingerprint, **voiceprint**, or scan of hand or face geometry." 740 ILCS 14/10 (emphasis added). "In other words, a biometric identifier is a unique personal feature that can be used to identify a person." *McDonald's*, 580 F.Supp. 3d at 515. "Biometric information" refers to "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier." 740 ILCS 14/10.

15.     While BIPA does not define "voiceprint," the dictionary defines it as a "distinctive pattern of curved lines and whorls made by a machine that measures human vocal sounds for the purpose of identifying an individual speaker." *McDonald's*, 580 F.Supp. 3d at 515 (citing "Voiceprint," BLACK'S LAW DICTIONARY (11th ed. 2019)).

16.     "The physical characteristics of one's voice and the manner of speaking are unique to every person and are stable enough to be used for extremely reliable identification."[5] Further, "[b]ased on voice samples that became known (directly or indirectly) to belong to certain individuals . . . and that would be typically stored in a database, it is possible to identify those persons at any moment in the future on the basis of the person's voice, even if no other identifiers would be revealed."[6] As such, voice recognition and voice AI technology pose serious risks, "from

---

[5] Oleksandr Pastukhov and Els Kindt, "Voice Recognition: Risks to Our Privacy," *Forbes* (Oct. 6, 2016), *available at* https://www.forbes.com/sites/realspin/2016/10/06/voice-recognition-every-single-day-every-word-you-say/?sh=6a3ce1af786d.

[6] *Id.* Indeed, "[f]orensic scientists may soon be able to glean more information from a mere

violations of privacy to infringements on copyright law – with uses in criminal activity or fraudulent activity….[7]

17.     BIPA requires that before a private entity can collect, capture, or otherwise obtain an individual's biometrics, it must: (1) inform the person in writing that biometric identifiers or information will be collected or stored, (2) inform the person in writing of the specific purpose and length of term for which such biometrics are being collected, stored, and used, and (3) obtain a written release from the person or their legally authorized representative authorizing the collection or his or her biometrics. 740 ILCS 14/15(b). The informed-consent requirement has been described by the Seventh Circuit as the "heart of BIPA," because it ensures that "consumers understand, before providing their biometric data, how that information will be used, who will have access to it, and for how long it will be retained." *Bryant*, 958 F.3d at 626.

18.     In addition, "no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c).

19.     BIPA also requires that

[a] private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first.

740 ILCS 14/15(a).

20.     BIPA provides a private cause of action for any person aggrieved by a violation of

---

recording of a person's voice than from most physical evidence." *Id.*

[7] "AI Voice Tech: What are the Privacy and Security Risks?," *Lexology* (June 21, 2023), *available at* https://www.lexology.com/library/detail.aspx?g=ad6dfe5c-a5e0-458a-bcff-63311942d8da.

the statute, and allows recovery of $1,000 for negligent violations and $5,000 for intentional or reckless violations, as well as attorneys' fees and litigation expenses, and injunctive relief. 740 ILCS 14/20.

## II. Defendants' Collection, Capture, Use, and/or Storage of Illinois Individuals' Biometric Identifiers and/or Biometric Information

21.     Wingstop has invested heavily in new technology initiatives in recent years,[8] referring to itself as "a tech company that serves flavor" and touting voice AI ordering as among the technology enhancements that would be "front and center in new restaurant format."[9]

22.     On March 2, 2023, Defendant ConverseNow, one of the leading voice AI technology platforms for restaurants,[10] announced the completion of an evaluation agreement with Wingstop and a pilot program under which ConverseNow's voice-AI powered virtual assistants would handle Wingstop's phone orders in select restaurant locations nationwide.[11]  In announcing the partnership, ConverseNow co-founder and CEO Vinay Shukla, stated:  "We're excited to partner and grow together with Wingstop. It's been a pleasure seeing how our AI has been embraced by their guests and staff while driving results in sales and average tickets."[12]

23.     As explained by ConverseNow,

> Voice AI, or conversational AI, is the newest generation of artificial intelligence for restaurants – a huge step up from the frustrating interactions we've all had in the past when talking to automated phone systems.

---

[8] *See generally* Wingstop 2023 10-K; Wingstop Investor Day Presentation.

[9] Wingstop Investor Day Presentation at 65.

[10] https://info.conversenow.ai/dfa-2.

[11] Press Release, "ConverseNow's Voice AI Soars to New Heights with Wingstop Partnership" (Mar. 2, 2023), *available at* https://www.prweb.com/releases/conversenow-s-voice-ai-soars-to-new-heights-with-wingstop-partnership-812192331.html.

[12] *Id.*

Introduced to guests as virtual ordering assistants, voice AI engages in limitless conversations at once: each with the personable, tailored approach that people expect when speaking to a team member. Combining the ease and efficiency of online ordering with the customizable, high-touch experience of traditional drive-thru and phone conversations, voice AI automates the previously time-consuming order-taking process with remarkable accuracy. And with national and international QSR [quick service restaurant] brands racing to integrate conversational AI into their operation, voice AI is sweeping the restaurant industry.[13]

24.     The way ConverseNow's voice AI technology works is as follows: "Voice AI uses natural language processing (NLP), natural language understanding (NLU) and machine learning algorithms to interpret and respond to speech, and to learn from these user interactions."[14]  This creates "a feedback loop where the voice AI platform continuously refines the underlying algorithms."[15] Moreover, "[p]rogress in voice AI capabilities not only allows accurate speech recognition and voice generation but also enables multilingual fluency and the implementation of custom voices. Casual consumers as well as business owners can tailor their selected voice AI platform to their preferred specificities."[16]

25.     ConverseNow's voice AI technology is touted as providing numerous benefits to restaurants. First, because it can handle "limitless" numbers of calls at the same time, there are "[n]o more missed orders because someone couldn't answer the phone or the customer hung up after hearing a busy signal."[17]  This increases sales, "[b]oost[s] output with team members entirely

---

[13] https://conversenow.ai/.

[14] "Conversational AI vs. Legacy Phone Systems: How Voice AI Prevails" (Oct. 5, 2022), *available at* https://conversenow.ai/resources/conversational-ai-vs-legacy-phone-systems/.

[15] *Id.*

[16] "The State of Restaurant Voice AI Technology 2022," *available at* https://conversenow.ai/resources/voice-ai/.

[17] https://conversenow.ai/technology/.

focused on prep, fulfillment and in-person service, without having to stop and answer the phone every few minutes," and "captur[es] upsell opportunities that team members may forget about or feel too rushed to attempt."[18] Indeed, ConverseNow boasts that its voice AI technology is helping restaurants to achieve 31% same-store sales growth and a 17% average increase in tickets (due to upsell), and is providing up to 71 hours of additional labor per store each month.[19]

26.     Conversenow's voice AI technology is also credited with "reduc[ing] employee turnover and improv[ing] employee retention by lightening the burden on team members who are stressed out from constant multitasking," "contribut[ing] to a satisfying customer experience through consistent, personalized guest service," and enabling restaurants "to cut costs while simultaneously improving productivity and profits."[20]

27.     Based on the investigation of Plaintiff's counsel, ConverseNow's voice AI technology is being used by at least 60 Wingstop locations in Illinois.

28.     Unbeknownst to Illinois customers, through the use of ConverseNow's voice AI technology, Defendants are collecting, capturing, otherwise obtaining, using, and/or storing customers' voiceprints, biometric identifiers, and/or biometric information in order to understand, analyze, interpret, and/or use their speech signals; to help improve the accuracy and effectiveness of ConverseNow's voice AI technology;[21] to gather customer-specific data and/or identify specific

---

[18] *Id.*

[19] https://info.conversenow.ai/dfa-2.

[20] "Why Voice AI is the Best Restaurant Management Strategy" (Jan. 26, 2023), *available at* https://conversenow.ai/resources/restaurant-management/.

[21] Indeed, "ConverseNow has achieved a remarkable 22% increase in overall AI accuracy since last year." "ConverseNow's Voice AI Assistants Redefine the Restaurant Industry with Outstanding Milestones and Growth" (Dec. 8, 2023), *available at* https://hospitalitytech.com/news-briefs/2023-12-03?article=conversenows-voice-ai-assistants-

customers; and to facilitate reordering and upselling.

29.     This is clear from ConverseNow's own descriptions of its voice AI technology:

> ConverseNow's "Voice AI uses natural language processing (NLP), natural language understanding (NLU) and machine learning algorithms to ***interpret and respond to speech, and to learn from these user interactions***. This results in a feedback loop where the voice AI platform continuously refines the underlying algorithms. Put simply, voice AI makes every conversation better than the last."[22]

30.     "***By processing millions of conversations a month, AI learns at an exponential rate***, akin to a top team member absorbing the lessons learned by every other team member and manager in not just your stores, but all stores across your brand where AI operates."[23] "[V]oice AI platforms use their ***memories of past conversations*** to recommend relevant order suggestions and upsells based on trends and guest order histories."[24] Further, "voice AI assistants aren't merely executing simple, scripted actions. ***Virtual assistants are dynamic conversationalists that recognize context clues, read between the lines and refine their algorithms with each order***. This means the ordering assistants ***learn to recommend relevant order suggestions and upsells based on prior guest orders***."[25]

31.     In addition, one of voice AI's biggest advantages over other technologies is its

---

redefine-restaurant-industry-outstanding-milestones-and-growth.

[22] "Conversational AI vs. Legacy Phone Systems: How Voice AI Prevails" (Oct. 5, 2022), *available at* https://conversenow.ai/resources/conversational-ai-vs-legacy-phone-systems/ (emphasis added).

[23] "AI vs. Call Center vs. Taking Orders In-Store" (Aug. 15, 2023), *available at* https://conversenow.ai/resources/ai-vs-call-center-vs-taking-orders-in-store/ (emphasis added).

[24] "A Guide to the Restaurant AI Installation and Training Process" (Dec. 21, 2022), *available at* https://conversenow.ai/resources/restaurant-ai/ (emphasis added).

[25] "6 Franchise Trends that Restaurant Operators Need to Know" (Oct. 21, 2022), *available at* https://conversenow.ai/resources/franchise-trends/ (emphasis added).

ability, through the use of "advanced analytics," to "provide[ ] insights into guest behavior once limited to direct interactions with an individual or through a guest feedback survey."[26] This is because "Voice AI uses machine learning to ***instantly store insights on each transaction** and process massive amounts of data*" and "can ***analyze patterns and trends** in the moment and **provide personalized recommendations to guests**.*"[27] Voice AI also "***uses sentiment analysis** to extract valuable insights on previous customer interactions to **tailor suggested upsells based on the customer's previous orders, as well as based on learning from other conversations the AI has experienced across millions of other guest interactions**.*"[28]

32.     In September 2023, ConverseNow announced a rollout of its latest, augmented virtual ordering assistant, which incorporates generative AI[29] from Open AI's ChatGPT and Bard to train its model:

> "With our platform serving more than one million guests every month, ConverseNow has the unique advantage of ***possessing domain-specific and up-to-date proprietary data. The access to this data allows us to continuously augment and improve these proprietary LLMs [large language models]** and deliver an even stronger guest experience, thereby creating an upward spiral of continuous improvement,"* Rahul Aggarwall, co-founder, COO and chief product officer, ConverseNow, said in the release.[30]

---

[26] "AI is Reshaping the Most Profitable Fast Food Chains" (Sept. 1, 2022), *available at* https://conversenow.ai/resources/most-profitable-fast-food-chains/.

[27] *Id.* (emphasis added).

[28] "Why Restaurants Need Voice AI, Not Just Call Centers, to Keep up with Demand" (July 8, 2022), *available at* https://conversenow.ai/resources/voice-ai-vs-traditional-call-centers/ (emphasis added).

[29] In contrast to conversational AI, which "focuses on facilitating natural language conversations between humans and AI systems," generative AI "focuses on creating new and original content using machine learning algorithms." https://medium.com/@social_65128/differences-between-conversational-ai-and-generative-ai-e3adca2a8e9a.

[30] "ConverseNow Intros AI Ordering" (Aug. 29, 2023), *available at* https://www.qsrweb.com/news/conversenow-intros-ai-ordering/ (emphasis added).

33. ConverseNow's patents also indicate that its voice AI technology collects, captures, otherwise obtains, uses, and/or stores individuals' voiceprints, biometric identifiers, and/or biometric information. For example, one ConverseNow patent, Patent Number 11,348,160 (May 31, 2022), titled "Determining Order Preferences and Item Suggestions," states:

> The ordering system may utilize the ordered items in combination with various contextual cues to **determine a customer identity which may then be linked to past orders and/or various order preferences**. Based on the **determined customer identity**, the system may provide recommendations of additional order items or order alterations to the customer before **personally identifying information (PII) has been collected from the customer**. The determination of the customer identity and the determination of recommendations may be performed by one or more machine learning algorithms that are trained on customer data, the retail store product listing, and associated data. **The customer responses and past orders may be used to continually update the machine learning models and improve the quality of the customer experience**.[31]

34. Another ConverseNow patent, Patent Number 2022/0277282 (Sept. 1, 2022), titled "Artificial Intelligence (AI) Order Taking System Enabling Agents to Make Corrections Via Point of Sale (POS) Devices," states:

> **The data that is generated by each order, including the customer's utterances (e.g., audio)**, the text (*e.g.*, created based on a transcription of the customer's utterances), the software agent's modifications to the contents of a cart based on the text, and the corrections made by the human agent to the text and to the contents of the cart **are stored and used at a later date as training data to retrain one or more machine learning algorithms**. In this way, the automatic speech recognition (ASR) algorithm that converts speech (*e.g.*, the customer's utterances) to text and the software agent's modifications to the contents of the cart based on the text may be **continually improved by the retraining to improve the accuracy of (i) the ASR algorithm and (ii) the AI-based software agent**.[32]

---

[31] https://image-ppubs.uspto.gov/dirsearch-public/print/downloadPdf/11348160 (emphasis added).

[32] https://image-ppubs.uspto.gov/dirsearch-public/print/downloadPdf/20220277282 (emphasis added).

35. ConverseNow's Patent Number 11,355,122 (Aug. 25, 2022), titled "Adaptively Modifying Dialog Output by an Artificial Intelligence Engine During a Conversation with a Customer," states:

> The systems and techniques described herein *determine a type of customer based on the words the customer uses, the speed of the delivery of the words, the inflection and pitch of the words, one or more emotions conveyed by the words, other information, or any combination thereof*. The type of customer is used to determine a user model. The systems and techniques use the user model and a conversation state *to adapt, in real-time, the dialog flow and recommendations*. By gaining a deeper understanding of the customer, the systems and techniques are able to improve the entire user experience when placing an order.[33]

36. ConverseNow's Patent Number 11,355,122 (June 7, 2022), titled "Using Machine Learning to Correct the Output of an Automatic Speech Recognition System," states:

> The AI engine may determine (e.g., predict) recommendations that the software agent provides in the response as part of the conversation. For example, the recommendations may be based on items that the customer has previously ordered. . . To determine items that the customer previously ordered, *the AI engine may determine an identity of the customer based on*, for example, *an identifier* (e.g., a phone number, an Internet protocol (IP) address, caller identifier, or the like) associated with the customer device, *voice recognition*, facial recognition (*e.g.*, in the case of a video call), *or another identifying characteristic*…[34]

37. And ConverseNow's most recent patent, Patent Number 11,862,157 (Jan. 2, 2024), titled "Automated Ordering System," states:

> *The conversation data* that includes the verbal interaction between the employee and the customer when the customer is placing an order *is archived*. *The conversation data is used to train an AI engine* to provide a software agent (e.g., sometimes referred to as a 'chat bot').

---

[33] https://image-ppubs.uspto.gov/dirsearch-public/print/downloadPdf/11355122 (emphasis added).

[34] https://image-ppubs.uspto.gov/dirsearch-public/print/downloadPdf/11355122 (emphasis added).

\*\*\*

> ***To determine items that the customer previously ordered, the AI engine may determine an identity of the customer based on***, for example . . . ***voice recognition*** . . . ."[35]

38.     Upon information and belief, Defendants have not informed individuals in writing that their biometric identifiers or biometric information is being collected, captured, or otherwise obtained, nor have they informed customers of the purpose or length of time for which such information is being collected, stored, or used. 740 ILCS 14/15(b).

39.     Upon information and belief, Defendants have not received written releases executed by individuals whose biometric identifiers and/or biometric information is being collected, stored, or used.

40.     Upon information and belief, Defendants do not have publicly-available written policies regarding the retention or permanent destruction of the biometric identifiers or biometric information that they possess, "when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first," as required by BIPA. 740 ILCS 14/15(a). As such, it is likely that Defendants are retaining Plaintiff and other similarly situated individuals' biometric identifiers and/or biometric information beyond the time limits set by BIPA.[36]

**III.     Plaintiff's Experience**

41.     In February 2023, Mr. Batchuluun called the Wingstop location at 1312 E Rand

---

[35]     https://image-ppubs.uspto.gov/dirsearch-public/print/downloadPdf/11862157     (emphasis added).

[36] Indeed, the only section of Wingstop's privacy policy relating to biometrics is for California residents. https://www.wingstop.com/privacy. Nor are any policies relating to biometric data or biometric information discussed on ConverseNow's website. https://conversenow.ai/privacy-policy/.

Road, Unit 1, Prospect Heights, Illinois, from his cellphone to place an order for food delivery. During the call, Mr. Batchuluun interacted with a voice AI assistant who took his order and collected certain personal information from Mr. Batchuluun, including his name and telephone number.

42.     Upon information or belief, the voice AI technology utilized for taking Mr. Batchuluun's order collected, captured, used, and/or stored his unique voiceprint, biometric identifiers, and/or biometric information.

43.     At no time before or during the call was Mr. Batchuluun ever informed (much less in writing), that his biometric identifiers or biometric information was being collected, captured, used, and/or stored by Defendants.

44.     Nor did Mr. Batchuluun ever provide a written release authorizing the collection, use, or storage of his biometric identifiers or biometric information.

## CLASS ALLEGATIONS

45.     **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(3) on behalf of a class of similarly-situated individuals, defined as follows (the "Class"):

> All individuals who had their voiceprints, biometric identifiers, and/or biometric information collected, captured, otherwise obtained, used, and/or stored by Defendants when making a telephone order at a Wingstop location in the State of Illinois at any time within the applicable statute of limitations.

46.     Excluded from the Class are Defendants; Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents has a controlling interest (as well as current or former employees, officers and directors); Plaintiff's counsel and Defendants' counsel; and the legal representatives, successors, and assigns of any such excluded persons.

47.     **Numerosity**: The members of the Class are so numerous that joinder of all

members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes there are many thousands of persons in the proposed Class.

48.     **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting only individual members. Common questions of law and fact include:

a.  Whether Defendants collected, captured, or otherwise obtained biometric identifiers and/or biometric information from Plaintiff and the Class;

b.  Whether Defendants stored Plaintiff and the Class's biometric identifiers and/or biometric information;

c.  Whether Defendants used Plaintiff and the Class's biometric identifiers and/or biometric information;

d.  Whether Defendants informed Plaintiff and the Class in writing that their biometric identifiers and/or biometric information were being collected, stored, or used, and, if so, for what purpose and length of time;

e.  Whether Defendants obtained a written release executed by Plaintiff and the Class before capturing, collecting, or otherwise obtaining their biometric identifiers and/or biometric information;

f.  Whether Defendants maintained a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and/or biometric information;

g.  Whether Defendants retained Plaintiff and the Class's biometric identifiers and/or biometric information beyond the time limits set by BIPA;

h.  Whether Defendants used Plaintiff and the Class's biometric identifiers and/or biometric information to identify them;

i.  Whether Defendants profited from Plaintiff and the Class's biometric identifiers and/or biometric information;

j.  Whether Defendants' conduct has violated BIPA;

k.  Whether Defendants' BIPA violations were committed intentionally, recklessly, or negligently; and

l.  Whether Plaintiff and the Class are entitled to damages and injunctive relief.

49.  **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class because the basis of Defendants' liability to Plaintiff and the Class is substantially the same, and all members of the Class have suffered similar injuries as a result of the same practices alleged herein.

50.  **Fair and Adequate Representation**: Plaintiff will fairly and adequately represent the interests of the members of the Class and have no interests antagonistic to or in conflict with those of the Class. Plaintiff's claims are typical of the claims of the members of the Class because the basis of Defendants' liability to Plaintiff and the Class is substantially the same, and all members of the Class have suffered similar injuries as a result of the same practices alleged herein. Further, Plaintiff has retained qualified counsel with substantial experience in prosecuting complex litigation and class actions nationwide.

51.  **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to

individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION
### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)
### (On behalf of Plaintiff and the Class)

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.     Defendants are private entities under BIPA.

54.     BIPA requires that "[a] private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a).

55.     Through their use of voice AI technology for telephone orders at Wingstop locations in Illinois, Defendants possessed, and exercised control over, Plaintiff and the other Class members' biometric identifiers and/or biometric information.

56.     Upon information and belief, at all relevant times, Defendants have never had written, publicly-available biometric identifier or biometric information retention or destruction policies in place, as required by BIPA. As such, it is likely that Defendants have not, and will not, destroy Plaintiff and the Class's biometric identifiers and/or biometric information within the time limits set by BIPA.

57.     Defendants' violations of BIPA, a statute that has been in effect since 2008, were intentional or in reckless disregard of the statutory requirements. Alternatively, Defendants

negligently failed to comply with BIPA.

**SECOND CAUSE OF ACTION**
**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)**
**(On behalf of Plaintiff and the Class)**

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     Defendants are private entities under BIPA.

60.     BIPA requires that before a private entity can collect, capture, or otherwise obtain an individual's biometrics, it must: (1) inform the person in writing that biometric identifiers or information will be collected or stored, (2) inform the person in writing of the specific purpose and length of term for which such biometrics are being collected, stored, and used, and (3) obtain a written release from the person or their legally authorized representative authorizing the collection or his or her biometrics.  740 ILCS 14/15/(b).

61.     Defendants collected, captured, or otherwise obtained Plaintiff and the other Class members' biometric identifiers and/or biometric information when they interacted with ConverseNow's voice AI technology while placing orders by telephone at Wingstop locations in Illinois.

62.     Defendants failed to inform Plaintiff and the other Class members in writing, in advance, that their biometric identifiers and/or biometric information was being collected or stored, as required by 740 ILCS 14/15(b)(1).

63.     Defendants failed to inform Plaintiff and the other Class members in writing of the specific purpose and length of term for which their biometric identifiers and/or biometric information is being collected, stored, and used, as required by ILCS 14/15(b)(2).

64.     Defendants failed to obtain a written release from Plaintiff, the other Class members, or their authorized representatives, as required by 740 ILCS 14/15(b)(3).

As such, Plaintiff and the other Class members' privacy rights and privacy interests in their biometric identifiers and/or biometric information have been violated.

65.     Defendants' violations of BIPA, a statute that has been in effect since 2008, were intentional or in reckless disregard of the statutory requirements. Alternatively, Defendants negligently failed to comply with BIPA.

**THIRD CAUSE OF ACTION**
**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)**
**(On behalf of Plaintiff and the Class)**

66.     Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

67.     Defendants are private entities under BIPA.

68.     BIPA provides that "no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c).

69.     Through their use of voice AI technology for telephone orders at Wingstop locations in Illinois, Defendants possessed, and exercised control over, Plaintiff and the other Class members' biometric identifiers and/or biometric information.

70.     Wingstop profited from Plaintiff and the other Class members' biometric identifiers and/or biometric information in the form of, *inter alia*, increased sales and profits, lower costs, increased productivity, and improved customer experiences.

71.     ConverseNow profited from Plaintiff and the other Class members' biometric identifiers and/or biometric information by, *inter alia*, using them to improve its voice AI technology, increase sales of the technology, and gain an edge over its competitors.

72.     As a result, Plaintiff and the other Class members have been injured by Defendants'

conduct, including through the unknowing loss of control of their unique biometric identifiers and/or biometric information and violation of their rights in, ownership of, and right to profit from, their unique biometric identifiers and/or biometric information.

73.     Defendants' violations of BIPA, a statute that has been in effect since 2008, were intentional or in reckless disregard of the statutory requirements. Alternatively, Defendants negligently failed to comply with BIPA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, respectfully requests that the Court enter an order as follows:

a.  Certifying the Class as defined above, appointing Plaintiff as Class Representative, and appointing the undersigned as Class Counsel;

b.  Declaring that Defendants' actions, as set forth herein, violate BIPA;

c.  Awarding injunctive and equitable relief as necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with BIPA;

d.  Awarding statutory damages of $5,000 for each intentional and/or reckless violation of BIPA;

e.  Awarding statutory damages of $1,000 for each negligent violation of BIPA;

f.  Awarding Plaintiff and the Class their reasonable litigation expenses and attorney's fees and costs;

g.  Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

h.  Awarding such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all claims that can be so tried.

Dated: March 20, 2024                    Respectfully Submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ J. Ryan Lopatka*
J. Ryan Lopatka (Bar Number 6303849)
161 N. Clark St., Suite 1700
Chicago, IL 60601
Telephone: (312) 759-9700
Facsimile: (504) 455-1498
Email: j.lopatka@ksfcounsel.com

Kim E. Miller
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

Lewis S. Kahn
Melissa H. Harris
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
Email: melissa.harris@ksfcounsel.com

-and-

**DON BIVENS, PLLC**
Don Bivens
Teresita Mercado
15169 N. Scottsdale Road
Suite 205
Scottsdale, Arizona 85254
don@donbivens.com
teresita@donbivens.com
602-708-1450

*Counsel for Plaintiff and the Putative Class*